**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GREGG A. SPINDLER and SUSAN L.**
**SPINDLER, d/b/a SGS STATISTICAL SERVICES,**

                        **Plaintiffs,**

        **vs.**                                    **5:15-CV-779**
                                                   **(TJM/TWD)**

**VIRGINIA ELECTRIC AND POWER COMPANY**
**d/b/a DOMINION VIRGINIA POWER; and**
**NORTH AMERICAN TRANSMISSION FORUM, INC.,**

                        **Defendants.**
_____

**Thomas J. McAvoy,**
**Senior United States District Judge**


                    **DECISION & ORDER**

        Before the Court is Defendant's motion for summary judgment.  See dkt. # 84.  The

parties have also filed motions to preclude certain expert testimony.  See dkt. #s 82-83.

The parties have briefed the issues and the Court has determined to resolve the issues

without oral argument.

**I.      BACKGROUND**

        This case involves claims by Plaintiffs, Gregg A. Spindler and Susan L. Spindler,

d/b/a SGS Statistical Services ("SGS"), that Defendants Virginia Electric and Power

Company, d/b/a Dominion Virginia Power ("Dominion"), and North Atlantic Transmission

Forum, Inc. ("NATF") breached contracts and misappropriated intellectual property

1

Plaintiffs developed and still use to evaluate the efficiency of electrical transmission in the United States.

The Spindlers commenced this action on June 25, 2015.  Defendants responded by filing a motion to dismiss Plaintiffs' conversion claim, which the Court granted after oral argument on November 10, 2015.  See dkt. # 23.  Defendants then answered the Complaint.  See dkt. # 24 & 25.  The parties attempted mandatory mediation but did not reach a settlement.  See dkt. # 63.  At the close of discovery, the parties filed three motions.  Plaintiffs moved to preclude certain portions of the testimony of Richard E. Brown and Joseph J. Galanti.  See dkt. # 82.  The Defendants moved to preclude the expert testimony of Michael J. Reilly.  See dkt. # 83.  The Defendants also moved for summary judgement.  See dkt. # 84.  The parties then briefed the issues, bringing the case to its present posture.

## II.   LEGAL STANDARD

Defendants seek summary judgment.  In addressing such motions, the Court must construe the evidence in the light most favorable to the non-moving party.  See Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  The Court may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party

2

believes demonstrate the absence of a genuine issue of material fact as to a dispositive

issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to

establish a *prima facie* basis for summary judgment, the burden of production shifts to the

party opposing summary judgment who must produce evidence establishing the existence

of a factual dispute that a reasonable jury could resolve in his favor.  See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly

supported motion for summary judgment may not rest upon "mere allegations or denials"

asserted in his pleadings or on conclusory allegations or unsubstantiated speculation.

See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v.

Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994).

## III.   DISCUSSION

The Defendants seeks summary judgement on several grounds.  The Court will

address each in turn, after a general discussion of the factual background.[1]

### A.   General Factual Background

Plaintiffs Gregg A. and Susan L. Spindler are statisticians.  Defendants' Statement

of Material Facts ("Defendants' Statement"), dkt. #85-1, at ¶ 1.[2]  They conduct business as

SGS Statistical Services.  Id.  Their business is for-profit; SGS offers consulting services

to utility companies which provide electric power transmission in the United States and

Canada.  Id. at ¶ 2.  Since 1995, SGS has annually produced and sold a "transmission

---

[1]The parties agree that New York law applies to this diversity action.

[2]Both sides submitted statements of material fact with citations to the record as required by the local rules.  The Court will cite to the Defendants' statement for undisputed facts and note disputes where they occur.

reliability benchmarking report" (the "Report").  Id. at ¶ 3.  The report compares the reliability of the electric power transmission systems that SGS's customers operate.  Id. Each customer pays a fee to purchase the SGS report.  Id.  Defendant Dominion Virginia Power is a utility company located in Richmond Virginia.  Id. at ¶ 4.  Dominion purchased the SGS report for a number of years.  Id.  Defendant North American Transmission Forum ("NATF"), a not-for-profit member organization of utility companies in the United States and Canada  headquartered in Charlotte, North Carolina, has since 2013 provided member utilities with "an annual transmission reliability benchmarking report ("NATF Report")" that compares the reliability of the participating members' electric power transmission systems.  Id. at ¶¶ 5-6.

Defendants define "transmission reliability benchmarking as "the practice of measuring the reliability of electric power transmission by comparing transmission attributes such as outage days."  Id. at ¶ 12.  Plaintiffs contend that this claim misstates the nature of reliability benchmarking.  Plaintiffs' Response to Defendants' Statement of Material Facts ("Plaintiffs' Response"), dkt. #97-3, at ¶ 12.  They define such benchmarking as "making reliability comparisons between different transmission companies at the system, voltage class and circuit level based on transmission circuit inventory and outage data."  Declaration of Gregg Spindler, dkt. # 97, at 7.  The parties agree that a transmission "outage" is "an emergency 'opening of a circuit breaker or switch in response to a fault or safety condition[.]'"  Id. at ¶ 13.  That event is similar to a circuit breaker that trips in a home.  Id.  Outages have a number of potential causes, such as failed equipment, weather problems, and vegetation falling on power lines.  Id. at ¶ 14. Public and private operators of power systems use various means to measure the

reliability of power systems.  Id. at ¶ 15.  Many such measurement systems compute averages such as outage per hundred circuit miles or outages per circuit or element.  Id. at ¶ 16.  Companies use these measures to judge their own performance and to compare that performance to that of other companies.  Id. at ¶ 17.  In the past several decades a number of such measures have been developed in the utility industry.  Id. at ¶ 18.  These systems include both SGS and NATF.  Id.

The dispute in this case is over the ownership and Defendants' alleged misuse of the SGS report.  Plaintiffs contend that their report represents a unique means of measuring reliability of electric transmission systems and that Defendants harmed Plaintiffs by obtaining and misusing that system of measurement in ways that violated their property rights, their business interests, and contractual agreements between the parties.  At the most basic level, Plaintiffs contend that NATF used SGS's Report and SGS's trade secrets to create its own report, which was released in 2013.  Plaintiffs allege that NATF supplied this report to member utilities, which undermined SGS's business.  The parties point to numerous additional facts in the record, which the Court will cite where relevant in reference to each of the claims in dispute.

### B.  Misappropriation of Trade Secrets

Defendants first argue that Plaintiffs' claim for misappropriation of trade secrets must be dismissed.  Plaintiffs, they contend, have not established that any trade secrets existed which Defendants could have misappropriated–the information Plaintiffs allege Defendants misappropriated was public knowledge, disclosed by Plaintiffs.  Moreover, the trade secrets Plaintiffs claim are commonly known in the industry and cannot be the

subject of protection.  In addition, Defendants insist, no evidence of misappropriation

exists.

In New York, a plaintiff claiming misappropriation of a trade secret must show:  "(1)

it possessed a trade secret, and (2) defendant is using that trade secret in breach of an

agreement, confidence, or duty, or as a result of discovery by improper means."

Integrated Cash Mgmt. Serv., Inc. v. Dig. Transactions, Inc., 920 F.2d 171, 173 (2d Cir.

1990).  A party claiming misappropriation must first demonstrate the existence of a trade

secret.  In New York, courts use the first Restatement of Torts, Section 757, to define

trade secrets.  See North Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999).  A

trade secret is "'any formula, pattern, device or compilation of information which is used in

one's business, and which gives him an opportunity to obtain an advantage over

competitors who do not use it.'" Ruckelshaus v. Monsanto co., 467 986, 1001 (1984)

(quoting RESTATEMENT OF TORTS § 757, Comment b).  Courts deploy six factors to

determine the existence of a trade secret:

> (1) the extent to which the information is known outside of [the] business; (2) the
> extent to which it is known by employees and others involved in [the] business; (3)
> the extent of measures taken by [the business] to guard the secrecy of the
> information; (4) the value of the information to [the business] and [its] competitors;
> (5) the amount of effort or money expended by [the business] in developing the
> information; (6) the ease or difficulty with which the information could be properly
> acquired or duplicated by others.

Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407 (1993) (quoting RESTATEMENT (FIRST)

OF TORTS § 757, cmt b (1939)).  "'[U]se' of a trade secret" can "include 'any exploitation of

the trade secret that is likely to result in injury to the trade secret owner or enrichment to

the defendant,' including 'marketing goods that embody the trade secret, employing the

trade secret in manufacturing or production, relying on the trade secret to assist or

accelerate research or development, or soliciting customers through the use of information that is a trade secret.'" Next Communication, Inc. v. Viber Media, Inc., No. 14-cv-8190, 2016 WL 1275659 at *4 (S.D.N.Y. Mar. 30, 2016) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c (Am. Law. Inst. 1995)).

In New York, "a trade secret 'may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" Hudson Hotels Corp. v. Choice Hotels Intl'l, Inc., 995 F.2d 1173, 1176 (2d Cir. 1993) (quoting RESTATEMENT OF TORTS § 757 cmt. b (1939); Delta Filter Corp. v. Morin, 108 A.D. 2d 991 (App. Div. 3d Dept 1975)).  An idea can constitute a trade secret, but "an action will not sound in tort for the misappropriation of an idea unless the idea was novel."  Id. at 1178. This rule exists because "'non-novel ideas are not protectible as property[;] they cannot be stolen.'" Id. at 1179 (quoting Murray v. National Broadcasting Co., 844 F.2d 988, 993 (2d Cir. 1988)).  "[A] trade secret is 'not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business.'" Bear Stearns Funding, Inc. v. Interface Group–Nev., Inc., 361 F.Supp.2d 283, 305 (S.D.N.Y. 2005) (quoting Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997)).  "'A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable asset.'" Norbrook Labs v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463, 483 (N.D.N.Y. 2003) (quoting Minnesota Mining & Mfg. Co. v. Pribyl, 249 F.3d 587, 595-96 (7th Cir. 2001)).  "The existence . . . of a trade

secret usually is treated as a question of fact."  Chevron U.S.A., Inc. v. Roxen Service, Inc., 813 F.2d 26, 29 (2d Cir. 1987).

### a.    The SGS Report

The dispute here concerns the SGS Report.  Plaintiffs began offering that Report in 1995.  Defendants' Statement at ¶ 31.  The Report offers benchmarking at several levels: transmission system or company level; different voltage class levels; and at the individual circuit level.  Id. at ¶ 32.  The Report provides a means of comparing a customers' system with another utility's, as well as to compare the performance of parts of its own system.  Id. at ¶ 33.  SGS compiles its analysis using five years of raw outage data at the individual circuit level, rather than using system or voltage class summaries.  Id. at ¶ 34.  Utilties are required to submit their outage data to SGS in a specific format that uses SGS codes for the causes of outages.  Id. at ¶ 35.  Companies that purchase the SGS Report pay a fee based on the size of their system.  Id. at ¶ 36.  The larger the system, the larger the fee. Id.  Each participant receives nearly 2,000 pages as part of the benchmarking analysis. Id. at ¶ 37.  They also receive a 300-page annual report, which is presented during an annual SGS conference in May of each year.  Id.

### b.    A Changing Regulatory Environment

The parties agree that prior to 2008 no standard format existed by which utilities would record information about transmission outages.  Defendants' Statement at ¶ 55. Each utility had its own methods for compiling such information, though such reports had some common features, such as the identity of the circuit, the date and time of the outage, and the cause.  Id.  A "major outage incident" in 2003 led to new regulations that altered

this situation.  Id. at ¶ 56.  Congress passed the Energy Policy Act in 2005, which

mandated the development of reliability standards in the transmission industry and

charged the Federal Energy Regulatory Commission ("FERC") with establishing them.  Id.

at ¶¶ 57-58.  FERC obtained authority to certify an "electric reliability organization," which

would issue rules and mandates to promote reliability.  Id. at ¶ 59.  FERC then certified the

North American Electric Reliability Corporation ("NERC") as such an organization.  Id. at ¶

60.  NERC's role expanded to include electric transmission reliability in both the United

States and Canada.  Id. at ¶ 61.

　　　　NERC established the Transmission Availability Data System ("TADS") in 2008.[3]

Id. at ¶ 62.  TADS requires transmission owners to submit outage data in format mandated

by NERC.  Id.  Plaintiffs contend that the TADS data "involved only" 20 per cent "of the

North American transmission grid outages on voltages above 200 kV."  Spindler Dec. at ¶

41.  After NERC's TADS task force issued a final report in September 2007, SGS began

to produce a NERC TADS Supplement.  Id.  SGS delivered that report to all customers in

fall 2007.  Id.  The report included voltages TADS did not use and served as an addition to

other reports SGS supplied.  Id.  The supplement came before NERC issued any TADS

annual reports and was produced using SGS-formatted data which had been converted to

the TADS format.  Id.  By late 2010, NERC had released two TADS reports for public

review.  Id. at ¶ 46.  Plaintiffs contend that SGS compared these reports to SGS's

statistical data, finding "many anomalies and inexplicable results in the underlying NERC

_____

[3]When NERC began TADS collection in 2008, NERC founded the Transmission
Owner and Operators Forum ("TOOF"), the predecessor to NATF, as a NERC entity.
Spindler Dec. at ¶ 41.

data and statistics."  Id.  Plaintiffs insist that NERC's report contained "only crude,

rudimentary tables and graphs."  Id.  Moreover, they allege, SGS customers found that

TADS results were not helpful to improving reliability.  Id.  Defendants contend that SGS

finds the TADS system "incompatible" with SGS's reporting and has insisted that

customers continue to submit data in the SGS format as opposed to TADS.  Defendants'

Statement at ¶ 63.  Plaintiffs contend that the statement about the incompatibility of the

SGS and TADS formats came from a period when TADS measured only circuits of 200 kV

or higher.  Spindler Dec. at ¶ 110.  For voltages 200 kV or larger, Plaintiffs insist, "data . . .

is largely compatible with SGS with the exception of differences in certain cause codes."

Id.

### c.    NATF's Report

NATF emerged in the changing regulatory environment described above as "an

industry organization to help facilitate communication among[] transmission companies[.]"

Defendants' Statement at ¶¶ 64-65.  The utilities that created NATF hoped "to improve

reliability in the industry as a whole."  Id. at ¶ 65.  They had as their model the Institute of

Nuclear Power Operations ("INPO"), which emerged after the Three Mile Island incident.

Id. at ¶ 66.  TOOF emerged from this process, operating under NERC.  Id. at ¶ 67.  TOOF

separated from NERC in 2010 and began operating NATF as a non-profit organization.

Id. at ¶ 68.  NATF sought to "'help promote the reliable operations of the electronic system

in North America.'"  Id. at ¶ 69.  The parties disagree about how NATF achieves these

ends.  According to the Defendant, NATF uses "various programs and initiatives," such as

"developing and 'exchanging best practices' among[] the membership and conducting

peer reviews" to suggest improvements in member companies.  Id. at ¶ 70.  Plaintiffs

allege that NATF works "through the sharing of 'tribal knowledge,'" which allows "NATF

members to provide their expertise and wisdom and translate their wisdom into action."

Plaintiff's Response at ¶ 70.

NATF established a "reliability metrics program" which aimed to use TADS data

submissions mandated by NERC from members "to obtain reliability benchmarking[.]"

Defendants' Statement at ¶ 71.  Defendants claim that the NATF Report emerged from

this metrics program; the Report offered "transmission benchmarking relying on TADS

data submissions (with additional sub-cause codes)."  id. at ¶ 72.

Plaintiffs allege that the NATF report appeared because of NATF's use of SGS's

data.  Plaintiffs contend that, "[i]dentical to SGS, the NATF relies upon outages collected

on an individual circuit basis by each member for all of its reliability reporting."  Spindler

Dec. at ¶ 105.  "Each outage has a circuit ID, the date and time of the outage, the

restoration, a cause code, and other ancillary information.  Also identical to SGS, the

NATF OMD and Report do not use NERC's mandatory ancillary information."  Id.  Plaintiffs

also contend that, beginning in 2013, NATF began to collect data and statistics for circuits

below 100 kV.  Id. at ¶ 106.  NATF could not use TADS-formatted data for these smaller

circuits because TADS did not require reporting for those circuits.  Id.  Plaintiffs allege that

"NATF used the SGS Study Data Requirements as its model to begin collecting data

below 200 kV for NATF.  Id. at ¶ 107.  They point to evidence they contend demonstrates

that Brian Starling, an employee of Defendant Dominion who "programmed the OMD and

was the main author of the NATF Report," had solicited SGS customers who were NATF

members to submit outage and circuit inventory for smaller circuits using the SGS data

11

requirements beginning in 2013.  Id.   Starling knew which NATF members would have

that data for lower voltages because of Dominion's participation in the SGS study.  Id.

Plaintiffs insist that having data in the SGS format "expedited development of the OMD

and the NATF Report," since TADS did not require collecting data for voltages less than

200 kV until 2015.  Id. at ¶ 109.  Even when TADS required data on such circuits, TADS

excluded momentary outages.  Id.  Plaintiffs contend that "SGS formatted data provided

NATF with immediate access to five years of complete data for voltages below 200 kV in

2013.  Id.

The parties disagree about whether TADS' outage data submission format differs

from SGS's.  Defendants contend that the two formats differ.  Defendants' Statement at ¶

73.  Plaintiffs contend that "[t]he raw data used by both SGS and the NATF is the same

data, with the exception of minor differences in outage root cause descriptors, which are

substantively cosmetic."  Spindler Dec. at ¶ 99.  Though Plaintiffs agree with Defendants'

expert that all utilities have "outage management systems," they argue that though "the

basic format of transmission outage data is generally known in the electric transmission

industry, internal reporting practices of each transmission system differ with respect ot

data regarding root causes of faults and failures, switching steps required for restoration,

customer or load impacts and changes in circuit inventory history."  Id.  The SGS Study

recognized these differences and developed reporting requirements that helped to

standardize the data and permit comparisons across systems.  Id.

The First NATF report appeared in September 2013.  Defendants' Statement at ¶

74.  The parties disagree in a number of ways about the similarities between the two

reports.  First, they disagree about how the NATF Report used benchmarking at the

individual circuit class level.  Id. at ¶ 75.  Defendants contend that the Report used "benchmarking analysis at the system and voltage class levels, but not at the individual circuit class level."  Id.  Plaintiffs contend that the Report "relies upon outages collected on an individual circuit basis by each member for all of its reliability reporting."  Spindler Dec. at ¶ 105.  Plaintiffs insist that the reporting used for the NATF study is "identical" to that for the SGS report.  Id.  The parties also disagree about whether NATF members can use the report to compare performance within their own system, as the SGS report allows.  Defendants' Statement at ¶¶ 76-77.  Defendants deny this possibility.  Id. at ¶ 76.  Plaintiffs assert that the "NATF Report provides comprehensive outage frequency and outage cause trend charting in addition to trend charts" that "are produced on a within-system basis and provide external NERC region references that are relevant only to that particular member."  Spindler Dec. at ¶ 146.  SGS marketed its survey, both before and after this litigation, in part on a statement that individual circuit level analysis in the SGS Report was "distinct" when compared to other benchmarking.  Defendants' Statement at ¶ 78.

The parties also disagree about the differences in the screening process for major disruption events used in the two Reports.  The NATF Report claims that "'[a]ll data analyzed . . . is screened for major events to provide normalized representation of each operating company's performance.'"  Id. at ¶ 79.  The NATF Report describes a process of screening out "extraordinary data" that would have a distorting "effect on the Six Sigma screening process."  Id. at ¶ 80.  A single operating company experiencing more than 15 outages in a calendar day would have those outages excluded from the screening.  Id.  NATF later changed this screening method to exclude days in which outages exceeded

5% of a member's total system, rather than an absolute number of outages.  Id. at ¶ 81.

Likewise, an outage lasting more than 30 days would be excluded.  Id. at ¶ 80.  After

processing the limits of the system, "a second routine runs to calculate the Six Sigma

thresholds for both frequency of operations per calendar day and the duration for

outages."  Id.  Values exceeding those thresholds get excluded.  Id.  Plaintiffs contend that

"defendants have provided no evidence that [the] pre-Screening method was derived

based on statistical analysis of the historical outage data."  Spindler Dec. at ¶ 132.  In any

case, Plaintiffs claim, both systems aim to "remove the most extreme, catastrophic events

to avoid raising the Six Sigma thresholds to the point that only the catastrophe is removed

from the outage data."  Id. at ¶ 133.

The NATF Report features three metrics of reliability: outages per one hundred

miles per year, outages per element (or circuit) per year, and average outage duration.

Defendants' Statement at ¶ 83.  The Report also has "a single-number composite scoring

metric," which the Report calls an "Integrated Performance Indicator Index ("IPIP.")  Id. at ¶

84.  Defendants contend that the IPIP emulates another composite scoring metric that

INPO has used since 1985.  Id. at ¶ 85.  Plaintiffs dispute this claim, pointing to testimony

that could be read to indicate that the persons who designed the IPIP had little knowledge

of the INPO metric when they designed the IPIP.  Spindler Dec. at ¶¶ 168-69.  NATF's

metrics director, for instance, "could not recall anything substantive about INPO's metrics

program," and "[m]embers of the Metrics team [who] were deposed had virtually no

knowledge of the INPO organization itself and none knew that the INPO Performance

Indicator was the inspiration, much less the model for the NATF IPII."  Id. at ¶¶ 168-69.

The parties do agree, however, about how NATF computes the IPII.  See Defendants'

Statement at ¶¶ 86-90.  They also agree that the SGS Report does not use the IPII.  Id. at ¶ 91.

### d.      The Trade Secrets in Question

The parties agree that eight purported trade secrets form the basis for Plaintiffs' misappropriation claim.  Id. at ¶ 99.  Those alleged trade secrets are:

> a.      The SGS Study Data Requirements document, which SGS alleges was "used as the primary basis for NATF Members that were also SGS Customers to submit outage data for voltages below 200 kV' for usage in the NATF Report;
>
> b.      The pre-screening methodology used by SGS, which permits SGS customers to subjectively identify outages to be excluded by using SGS Cause Code 10 (for "natural catastrophic events") and SGS Cause Code 11 (for "other events");
>
> c.      The combined pre-screening (through SGS Cause Codes 10 and 11) and Six Signma screening methodology utilized by SGS;
>
> d.      The use of pre-screening and Six Sigma screening for the computation of "per circuit" and "per 100 mile" metrics for individual outage cause categeories
>
> e.      The use of pre-screening and Six Sigma screening for computation of "per circuit" and "per 100 mile" metrics for aggregations of outage cause code categories;
>
> f.      The use of a 0 to 100 scale "for scoring outage cause-specific performance metrics and aggregations thereof";
>
> g.      Using the "novel assignment of a '100' score for top performance"; and
>
> h.      [SGS's] TACS composite scoring methodology.

Id. at ¶ 99.

### e.      Analysis

Defendants argue that no evidence supports Plaintiffs' misappropriation claim on various grounds.  The Court will address each ground in turn, providing additional relevant evidence as appropriate.

### i.      Secrecy of the Information

Defendants first argue argue that Plaintiffs have repeatedly disclosed their trade secrets and have failed to take sufficient measures to protect the information.   "[S]ecrecy" is "an essential requisite to legal protection" of a trade secret.  Delta Filter Corp. v. Morin, 108 A.D.2d 991, 992, 485 N.Ys.2d 143, 144 (3d Dept. 1985)).  Under New York law, "secrecy" applies "in two related senses: (1) as substantial exclusivity of knowledge of the" trade secret, and "'[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret'"; and "(2) as the employment of precautionary measures to preserve such exclusive knowledge by limiting legitimate access by others.'" Id. (quoting RESTATEMENT OF TORTS § 757 comment b (1939)).  In other words, "[i]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret" and when "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." Ruckelshaus, 467 U.S. at 1002 (applying RESTATEMENT OF TORTS § 757).   Still, "'[a]bsolute secrecy . . . is not required.'" Thin Film Lab, Inc. v. Comito, 218 F.Supp.2d 513, 520 (S.D.N.Y. 2002) (quoting Anacomp, Inc. v. Schell Knob Services, Inc., 1994 U.S. Dist. LEXIS 223, at *9 (S.D.N.Y. 1994)).  Instead, "a 'substantial element of secrecy must exist and this means so much that except by use of improper means, there would be difficulty in acquiring the information.'" Id. (quoting Q-Co Industries, Inc. v. Hoffman, 625 F.Supp. 608, 617 (S.D.N.Y. 1985)).

Defendants argue that the Plaintiffs have disclosed the trade secrets listed above in the Summary Report, and that this failure to maintain secrecy invalidates their claim.  As a general matter, the SGS Report contains "'technical discussion, graphical and tabular

16

performance summaries using anonymous voltage class IDs and proprietary sections.'"

Defendants' Statement at ¶ 38.  SGS provides customers a shorter Summary Report, as

well as an extended Summary.  Id. at ¶ 39.  SGS provides customers with "Terms of Use,"

which state in relevant part:

> 1.8  Much of the information contained therein is the confidential trade secret and proprietary information of SGS which was developed at great expense to SGS . . . Company cannot provide the Study or any portion thereof **except as provide in subsections 1.9 and 1.10** to third parties including, but not limited to, regulatory agencies, other transmission owners or operations which are not participating in the study, consultants, contractors, professional or trade associations and competitors of SGS without SGS's written approval.
>
> 1.9 Company is provided a Summary.  This document contains general information regarding SGS study methods and a limited number of anonymously-identified high-level summary performance values of other Participants.  Company is explicitly identified in its own Summary. **Company, at its own discretion, may release and reproduce the Summary**.

Id. at ¶ 40 (emphasis in original).

Defendants point to marketing materials distributed in connection with the Report

that state that "The Study Report is a copyrighted document and may not be circulated

outside of the study group under any circumstances.   The Executive Summary and

company-specific analyses may be circulated."  Id. at ¶ 41.  Plaintiffs contend that these

paragraphs were used more than ten years ago.  Plaintiffs' Response at ¶ 41 (citing

Declaration of Gregg A. Spindler ("Spindler Dec."), dkt. # 97, at ¶ 95).  Plaintiffs point

instead to the "Terms of Use" cited above, which were "in place since the mid-1990s, or

the specific instructions" Gregg Spindler "provided to SGS participants during our annual

conferences."  Spindler Dec. at ¶ 95.

Defendants also contend that the SGS Summary "discusses certain features of the SGS Report." Defendants' Statement at ¶ 42. Plaintiffs deny this statement, noting that the Summary "only states '[t]his is a Summary of the more detailed SGS Study Report binder and is intended to provide a small subset of reliability comparisons of system standings and trends.'" Spindler Dec. at ¶ 96. At the same time, Plaintiffs do not dispute the accuracy of certain statements Defendants quote from the Summary. For instance, Defendants point out that the Summary stresses the need to examine performance at the individual circuit level, stating:

> System-level performance metrics, in our opinion, are informative but should **never** be the final arbiter of performance. They seldom quantify customer experiences, nor the ability of a transmission owner to meet customer expectations. Performance must be assessed at a much more granular level. *Each and every transmission line (and other major element of the grid) should have a rigorous, defensible "Circuit Importance" value*[.]

Defendants' Statement at ¶ 43. (emphases in cited original). The Summary also explains that the SGS report excludes major events and outlier data before performing certain analyses of metrics. Id. at ¶ 44.

Screening for the Report and its Summary takes two forms. Id. at ¶ 45. Participants themselves designate certain events as "excludable" in several categories, including "nature events" such as "storms, wildfires, and other extreme events" that cause power outages of long duration. Id. at ¶ 46. SGS has "cause codes" for these events. Id. at ¶ 47. Next, SGS applies its own "Six Sigma screening 'to moderate IEEE-type statistics [that are] based on averages.'" Id. at ¶ 48. The Summary provides an explanation of this Six Sigma screening program:

> Major Event Screening (or Six Sigma Screening). A statistical method for screening extreme event-days from outage data. Screening is performed

18

> using a 5 year moving average.  Average values for daily number of outages and daily duration are calculated.  The five year mean plus six standard deviations are used to identify screening thresholds for outage-days.  Days which exceed the threshold are removed from analysis for metrics using averages.  Individual outages are capped at 72 hours for calculation of thresholds only.

Id. at ¶ 49.

The Summary also explains how the Report uses common performance metrics such as outages per 100 circuit miles per year, as well as other metrics the IEEC publishes.  Id. at ¶ 50.  Defendants aver that the Summary also describes how the Report uses "per circuit" and "per 100 mile" statistics in measuring individual causes of outages and aggregations of outages.  Id. at ¶ 51.  Plaintiffs deny this claim, contending that the Summary and the SGS website lack a "reference to 'per circuit' or 'per 100 mile' statistics for individual outage cause categories or aggregations of cause categories which are subject ot pre-Screening and Six Sigma Screening."  Spindler Dec. at ¶ 140.

The Summary reveals that the Report uses a "single-number composite score developed by SGS" and called the "Transmission Availability Composite Score. ["TACS"]'"  Id. at ¶ 52.  The Summary describes these scores, stating:

> The SGS Transmission Availability Composite Score (TACS), composed of percentile rankings: Composite+2.5 x (Recent Time Between Failures %).  Data used in TACS computation contains five years of age-weighted outage data, with approximately 80% of weight in the most recent 2 years and 20% of weight in years 3, 4 and 5.  TACS is anchored in a 0 (bad) to 1000 (good) range.  No screening applied, SGS categories 10-11 removed.

Id. at ¶ 53.  The SGS Summary also contains graphs and charts that display the results of benchmarking analysis.  Id. at ¶ 54.

The parties agree that the Summary Report could be reproduced and shared with others who had not participated in the SGS Report, but disagree whether the Summary

Report contains the trade secrets Plaintiffs claim Defendants misappropriated.  <u>See</u>

Defendants' Statement at ¶¶ 101-102; Plaintiffs' Response at ¶¶ 101-102.  The parties

also disagree whether a version of the SGS Summary was available for unrestricted view

on the internet.  <u>See</u> Defendants' Statement at ¶ 103.  Plaintiff's contend that this

"executive summary" was prepared for a utility, Entergy, and that SGS did not authorize

anyone to post the summary on the internet.  Plaintiffs' Statement at ¶ 175.  Plaintiff

claims that because of the way that SGS shared the summary with another regulated

entity, Entergy was forced by FERC rules to post the document to FERC's Open Access

Same-Time Information System (OASIS).  <u>Id.</u>  Entergy declined SGS's request that the

Summary be removed.  <u>Id.</u>  In any case, Plaintiffs insist, the 2003 Executive Summary did

not contain any trade secrets.  <u>Id.</u>

Defendants point to five specific trade secret claims as foreclosed by the

information contained in the Summary: (1) pre-screening of major events or other outliers;

(2) Six Sigma screening; (3) screening for computation of per-circuit and per-100 mile

individual statistics; (4) screening for computation of per-circuit and per-100 mile

aggregate statistics; and (5) the TACS scoring metric.  Defendants argue that the terms of

use for the Summary provided to each recipient, which permit disclosure of the information

contained there, foreclose any argument that disclosure of such information cannot

constitute misappropriation.  As far as that goes, the Defendants are correct.

The Plaintiffs do not assert any trade-secret protection for the information disclosed

in the Summary, however.  Instead, they contend that the information in the Summary is

merely a description of the trade secrets lacking sufficient "detail to allow a reader to

implement any of the methods."  Plaintiffs could not prevail if the Summary contained

20

trade secrets since, as explained above, the terms of the agreement in question explicitly permitted Defendants to disclose information from the Summary.  Thus, Plaintiff could not show that Defendants "used" any trade secret contained in the summary "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).  If the Plaintiff's claim were based solely on misappropriation of the information in the Summary or if the Summary unquestionably contained trade secrets the Court would grant the motion.

The Court finds that there is a question of fact as to whether the Summary contains trade secrets.  A reasonable juror could conclude that the information in the summary informs readers of the allegedly secret methods Plaintiffs used to construct their reports, the methodology Plaintiffs used to collect and analyze data, and the ways in which the Report organized and disclosed that data.  At the same time, however, a reasonable juror could conclude that the Summary protects the actual source of the trade secrets by providing general information about how Plaintiffs collect data and establish reliability rates and measures but keeping to the Report the methods behind the data presented in the summary.  A trial is necessary to resole this dispute.

The Court's inquiry does not end here, however.  Defendants also contend that the Plaintiffs revealed their trade secrets in presentations and on websites.

Defendants first point to marketing materials and presentations that Plaintiffs produced.  See Defendants' Statement at ¶¶ 104-108.  A marketing pamphlet produced from 2001 through 2006, for instance, explained that SGS screened outage data to exclude extreme events, that it used metrics to calculate TACS, and produced data

requirements used to participate in the SGS Report.  Id. at ¶ 104.  In other presentations,

Defendants Claim, Greg Spindler discussed the SGS Report, including the trade secrets

contained therein, with third-parties who had no obligation to keep the information

confidential.  Id. at ¶ 105.  On September 6, 2004, for example, Spindler spoke to NERC,

presenting a number of slides.  Id. at ¶ 106.  The slides described SGS's Transmission

Availability Composite Score ("TACS").  Id.  One slide reported that TACS offered "[a] one-

number summary of reliability performance" that used five years of data to provide a

"historical measure of risk," serving as a "relative measure, based on percentiles."  Id.

TACS, the slide claimed, was "[c]omputed on a *between-system* (for benchmarking) and

*within-system* (for decision support) basis."  Id. (emphasis in original).  Another slide

reported that "TACS combines four equally-weighted reliability measures into a single

number," and then described those measures.  Id.  The TACS score had a range from 0 to

1000, and averaged around 500 when measuring a system.  Id.  Another slide described

how data could be converted to percentiles, and provided an equation for calculating a

composite score.  Id.

At another presentation, on October 3, 2012, Spindler again described SGS

screening methodologies.  Id. at ¶ 107.  His slides for that presentation explained that the

SGS Study used "two forms" of screening: a "statistical method" that used Six Sigma

screening and was applied identically to all systems for both outages and duration and a

filtering screening that removed extreme events.  Id.  The slide described how study

participants could designate some events as "excludable" in various categories.  Id.

Spindler's slides also detailed Six Sigma screening, providing a graph with groupings by

years.  Id.  That slide noted that "Six Sigma screening is necessary to moderate" other

industry "statistics based on averages."  Id.  Spindler also revealed that "[t]he threshold is the daily mean plus six standard deviations."  Id.  SGS screened outages and duration separately.  Id.  Spindler made a presentation to the National Rural Electric Cooperative Association in 2013 where he showed similar slides.  Id. at ¶ 108.  Participants in these 2013 presentations included non-SGS subscribers.  Id. at ¶ 109.  They did not sign non-disclosure agreements.  Id. at ¶ 111.

The parties also dispute whether SGS's alleged trade secrets are disclosed on the SGS website.  Id. at ¶ 112.  Plaintiffs' Response at ¶ 112; Spindler Dec. at ¶¶ 111-112. Plaintiffs contend both that the website in question has restricted access that disclosed detailed information only to SGS study participants and that any information made publically available did not reveal the trade secrets.  Spindler Dec. at ¶¶ 111-112. Defendants assert that the information on the SGS website include "a sample of an SGS data submission . . . the SGS Data Requirements document, . . . a presentation regarding SGS data requirements . . . and presentations discussing TACS and other aspects of the SGS Report."  Defendants' Statement at ¶ 113.  Plaintiffs argue that this information is insufficiently detailed to reveal trade secrets.  Spindler Dec. at ¶ 112.

In general, Plaintiffs argue that any public expression of the SGS system does not reveal the details of the SGS survey in a way that exposes secrets.  In response to Defendants' claim that Spindler's presentations revealed trade secrets and undermine Plaintiffs' misappropriation claims, for example, Spindler states that:

> As a statistical consulting business and provider of benchmarking to a narrow niche of the electric transmission industry, SGS markets to persons with engineering and technical backgrounds.  The marketing presentations are designed to illustrate the distinctive features of the SGS Study with sufficient information for those engineering and technical employees to appreciate the value of the SGS Study.

> The conceptual information that I present, in and of itself, is not sufficient for any person or entity to conceive, program, test and deliver a product similar to the SGS Study or Summary.

Spindler Dec. at ¶ 177.  In addressing specifically the claim that disclosing the concept of converting data into a 0 to 100 scale reveals the trade secret Plaintiffs seek to protect, Plaintiffs respond that:

> the trade secret claim relating to 0-100 scoring is based on (a) pre-Screened and Six Sigma Screening of outage data, (b) summarizing outage data for strata based on outage cause categories (or aggregations thereof) on a "per circuit" or per 100 mile" basis, (c) rank-ordering of "per circuit" and "per 100 mile" performance statistics (d) "novel" assignment of 100 for "top performance" and (e) for strata having less than the arbitrarily defined "top performance" threshold, a less than 100 score is based on relative rankings dependent upon the other strata (e.g. ranging from 10 to 85, 90 or 95).  The trade secrets are not contained in any of the exhibits referenced [by] Defendants' Statement of Material Facts, nor could they be inferred from them.

Id. at ¶ 165.

The Court finds that a question of fact exists as to whether Plaintiffs disclosed the trade secrets in question in the settings claimed by the Defendants.  The evidence recited above does indicate that Plaintiffs' marketing presentations and web filings made reference to the many of the trade secrets for which Plaintiffs seek protection.  Defendants contend that the information provided in these public fora, which were largely unrestricted, would permit any reasonably astute consumer of the data to construct a study similar to the Report.  Defendants' expert takes that position.  A reasonable juror could certainly come to that conclusion.

A reasonable juror could also conclude, however, that Plaintiffs took reasonable steps to protect the confidentiality of the information they claim as trade secrets.  As emphasized by the factors related above, "'the courts require that the possessor of a trade

secret take *reasonable measures* to protect its secrecy.'" <u>Defiance Button Mach. Co. v. C & C Metal Prods. Corp.</u>, 759 F.3d 1053, 1063 (2d Cir. 1985) (quoting 1 R. Milgram, Milgram on Trade Secrets § 2.04, at 2-36 (1984) (emphasis added).  In the end, "a trade secret must first of all be secret; whether it is generally a question of fact."  <u>Ashland Management v. Janien</u>, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 1013 (1993).  In other words, the question of the measures that the possessor of trade secrets took to protect them is usually a jury question.

Plaintiffs took numerous steps to protect their secrets.  They restricted the ability of subscribers to share the information they received and the methods described in the detailed Report.  A reasonable juror could certainly conclude that these restrictions on sharing the details of SGS's methodology and calculations were reasonable attempts to protect the trade secrets involved.  Likewise, a reasonable juror could find that Plaintiffs made reasonable efforts to protect their trade secrets while promoting them at trade shows and other events; Plaintiffs attempted to tread a delicate line between providing sufficient information to entice new customers and providing so much information that any viewer could reconstruct their methods.  A reasonable juror could find that disclosing the use of Six Sigma screening and 0-100 scales, for instance, simply described how the data in the report would generally be constructed and presented and maintained the trade secret of how Plaintiffs used those methods and constructed that data.

The Court is partly persuaded by the fact that the SGS report combined the various alleged trade secrets into a coherent whole; revealing parts of parts of that whole does not necessarily undermine the secrecy Plaintiffs sought to maintain.  The Court is not persuaded that the disclosure was so obvious that a jury should not be permitted to

determine whether Plaintiffs took adequate measures to protect their secrets.  See A.H. Emery Co. v. Marcan Products Corp., 489 F.2d 11, 16 (2d Cir. 1968) ("'[S]ecrecy' is a relative term and, as used in the law of trade secrets, it is not an absolute but equitable concept."  Evidence that parts drawings were shown on "'a few rare instances' where parts drawings might have been shown or sent to customers but in those instances the parts drawing revealed only the external portions and 'whatever we send out did not show the internal construction of the cell, the internal workings of the cell.'").  Defendants' motion will be denied in this respect.

### ii.    Knowledge of Alleged Trade Secrets in the Industry

Defendants also argue–briefly–that the alleged trade secrets identified above all represent common knowledge in the industry and therefore cannot qualify as trade secrets.  They point to the expert report of Richard Brown, PhD, who finds that "all of the trade secrets identified by SGS are commonly known in the industry and available in the public domain."  Defendants' Statement at ¶ 116.  Defendants further contend that failing to provide an expert report to rebut Dr. Brown's findings is fatal to Plaintiffs' trade-secret claims. Plaintiffs rebut this statement by pointing to the Declaration of Gregg Spindler, who–with his wife, another statistician–developed the SGS study.  Plaintiffs' Response at ¶ 116.

The Court will deny the Defendants' motion on these grounds as well.  "The existence . . . of a trade secret usually is treated as a question of fact."  Chevron U.S.A., Inc. v. Roxen Service, Inc., 813 F.2d 26, 29 (2d Cir. 1987).  While a jury may accept the testimony of Dr. Brown and conclude that nothing in the SGS Report is unique or not publically known, a jury could also consider Brown's testimony in light of Gregg Spindler's

26

testimony and conclude that the trade secrets cited above are unique and not obvious to people in the field.  As a question of fact exists concerning the existence of a trade secret, the Defendants' motion must be denied in this respect as well.

The Court is partly persuaded by the fact that, as explained above, "'[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable asset.'" Norbrook Labs v. G.C. Hanford Mfg. Co., 297 F.Supp.2d 463, 483 (N.D.N.Y. 2003) (quoting Minnesota Mining & Mfg. Co. v. Pribyl, 249 F.3d 587, 595-96 (7th Cir. 2001).   For these reasons, a question of fact exists as to whether Plaintiff's possess trade secrets that Defendants could misappropriate.

### iii.    Misappropriation

Defendants also contend that, even if Plaintiffs have protected trade secrets that are not publically known, no evidence of misappropriation exists.  NATF did not breach any agreement in using the alleged trade secrets or acquire them by any improper means.  Moreover, the substance of the analyses produced in the SGS Report and the NATF report are distinct and thus no evidence of improper use exists.  Plaintiffs point out that Defendants had access to SGS's trade secrets and after accessing those secrets constructed a reliability report that shared many components of Plaintiffs' own report.

Evidence of misappropriation may be circumstantial.  Electro-Miniatures Corp. v. Wendon Co., Inc., 771 F.2d 23, 26 (2d Cir. 1985); see, e.g., Q-Co Indus. v. Hoffman, 625 F.Supp. 608, 618 (S.D.N.Y. 1984) (finding that "[i]t is well recognized with respect to trade secrets that: 'misappropriation and misuse can rarely be proved by convincing direct

27

evidence.  In most cases plaintiffs must construct a web of perhaps ambiguous

circumstantial evidence from which the trier of fact may draw inferences which convince

him that it is more probable than not that what plaintiffs allege happened did in fact take

place.  Against this often delicate construction of circumstantial evidence there frequently

must be balanced defendants and defendants' witnesses who directly deny everything.'")

(quoting Greenberg v. Croydon Plastics Co., Inc., 378 F.Supp. 806, 814 (E.D.Pa. 1974));

Stanacard, LLC v. Rubbard, No. 12cv5176, 2016 U.S. Dist. LEXIS 15721 at *54 (S.D.N.Y.

Feb. 3, 2016) (evidence of an "overlap in the lists of" the parties' "vendors and customers .

. . and the similar nature of the two companies' management consoles . . . and referral

programs, combined with" defendants' "access to [Plaintiff's] proprietary information" was

evidence of use sufficient to avoid summary judgment even without direct evidence of

use).   Moreover, the emphasis in a misappropriation action is on the conduct of the

defendant:   "'it is no defense in'" a trade-secret case "'that the process in question *could*

*have* been developed independently, without resort to information gleaned from the

confidential relationship . . . Even if resort to the patterns of the plaintiff was more of a

convenience than a necessity, still, if there was a secret it belong to [plaintiff], and the

defendant had no right to obtain it by unfair means, or to use it after it was thus obtained.'"

Norbrook, 297 F.Supp.2d at 485-86 (quoting Imperial Chem. Indus. Ltd. v. Nat'l Distillers

and Chem. Corp., 342 F.2d 737, 743 (2d Cir. 1965) (emphasis in original, internal citations

omitted)).

   The Court finds that a question of fact exists as to whether Defendants

misappropriated Plaintiffs' trade secrets.  Courts have concluded that "a claim of

misappropriation based on copying can be established 'by showing access and substantial

28

similarity.'" Advanced Analytics, Inc. v. Citigroup Global Mkts., No. 04cv3531, 2009 U.S.

LEXIS 130133 at *73 (S.D.N.Y. Aug. 2009) (quoting Julie Research Lab. v. Select

Photographic Eng'g., 810 F.Supp. 513, 518 (S.D.N.Y. 1992)).  Defendants were

participants in Plaintiffs survey and received copies of the Reports that contained the trade

secrets in question.  Their access to the secrets is beyond doubt.  While the parties

disagree about the similarity of the two studies, Plaintiffs have presented evidence in the

form of the testimony of Gregg Spindler that a jury could use to conclude that the two

surveys are substantially similar as result of Defendants' use of the Plaintiffs' trade

secrets.  They have also pointed to evidence from persons who were familiar with the

SGS Report who later received copies of the NATF Report and found them substantially

similar.  Shaker Manns, for instance, testified that he was "surprised" by the "similarities"

between the two reports.  Deposition of Shaker Manns, dkt. # 95-7, at 56.  The NATF

Report "looked so much like SGS, I didn't understand why would the NATF create

something that's already in existence and why not just go to Gregg [Spindler] directly[.]" Id.

at 56-57.  A reasonable jury could use such evidence to find a substantial similarity, and

summary judgment is therefore inappropriate on this claim.

For the reasons stated above, the Court will deny the Defendants' motion with

respect to the misappropriation of trade secrets claim.

## C.    Unfair Competition

Defendants also seek summary judgment on Plaintiffs' unfair competition claim.

"Under New York law, '[a]n unfair competition claim involving misappropriation usually

concerns the taking and use of the plaintiff's property to compete against the plaintiff's

own use of the same property[.]'"  ITC v. Punchgini, Inc., 9 N.Y.3d 467, 478, 990 N.E.2d

852, 859 (2007) (quoting Roy Export Co. v. Columbia Broadcasting Sys., 672 F.2d 1095,

1105 (2d Cir. 1982)).  The plaintiff must show "'that it had compiled information used in its

business that provided an opportunity to obtain a competitive advantage and that a

competitor misappropriated it.'"  Miller v. Waters, 997 N.Y.S.2d 237, 246 (Sup. Ct. N.Y.

Cnty, 2014) (quoting Edelman v. Starwood Capital Grp., LLC, 2008 WL 2713489, at *3

(Sup. Ct. N.Y. Cnty. Jun. 27, 2008)).

   The Court finds, as explained above, that evidence exists by which a jury

could conclude that Defendants misappropriated Plaintiffs' efforts and property in creating

the NATF Report.  Defendants do not address this issue, but instead argue that summary

judgment must be granted because Plaintiffs have no evidence that consumers were

confused about the source of the Reports.  Defendants insist that no such evidence exists.

   The Court is unconvinced that Plaintiffs need to prove a likelihood of confusion to

prevail on their New York unfair competition claim.  New York Courts "have long

recognized two theories of common-law unfair competition: palming off and

misappropriation."  ITC Ltd., 9 N.Y.3d at 476.  "'[P]alming off'" is "the sale of the goods of

one manufacturer . . . for those of another."  Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d

556, 567 (1957).  "Palming off is an attempt by one person to induce consumers to believe

that his product is actually that of another; it requires an intent to deceive of proof of actual

fraud."  Ralston Purina Co. v. Thomas J. Lipton, Inc. 341 F.Supp. 129, 135 (S.D.N.Y.

1972).  Courts in cases of palming off have analogized unfair competition to Lanham Act

trademark claims, and have required evidence of actual confusion to obtain damages.

See, e.g., W.W.W. Pharam, 984 F.2d at 576; Perfect Fit Indus., Inc. v. Acme Quilting

Co.,Inc., 618 F.2d 950, 953-955 (2d Cir. 1980); Paco Sport, Ltd. v . Paco Robanne

Perfumes, No. 00-7344, 2000 U.S. App. LEXIS 29570 (2d Cir. Nov. 16, 2000).

Plaintiffs' unfair competition claim, however, is not a "palming off" claim; Plaintiffs do not allege that unfair competition existed because Defendants attempted to pass off the NATF Report as the SGS Report. Instead, Plaintiff's claim is a "misappropriation" claim, one where Defendants have allegedly "misappropriate[d] the results of the skill, expenditures and labors of a competitor[.]" Electrolux, 6 N.Y.2d at 567. Such a claim requires only a showing "'that the defendant (1) misappropriated the plaintiff's labors, skills, expenditures, or good will, and (2) displayed some element of bad faith in doing so.'" Sidney Frank Importing Co.., 998 F.Supp.2d at 209.

To meet this burden, Plaintiffs point to the deposition testimony of Manns and Douglas Maddox. Both of these men, with long experience in the transmission industry, considered the NATF Report simply a "copy" of the SGS report. Plaintiffs point to the Manns testimony cited above. Maddox likewise testified that the documents "looked very similar. Had different color codes. But the bar graphs, the charts, the–everything looked like it was taken from the SGS Report." Deposition of Douglas Maddox, dkt. # 95-8, at 42.

The Court finds that a reasonable juror could use this evidence to conclude both that NATF misappropriated the efforts and labor Plaintiffs used to produce the SGS Report, and that Defendants displayed bad faith in that misappropriation. Both Maddox and Manns concluded that NATF had "copied" the SGS report and then passed the document off as NATF's work. The evidence also indicates that Defendants subscribed to the SGS Report and used restricted information to undercut SGS's market. A reasonable juror could also conclude that the purpose of that copying was to avoid paying SGS for the considerable work, time and effort that SGS had expended over years in developing the

31

report.  Such conclusions could lead a reasonable juror to find for Plaintiffs on the unfair

competition claim.  The Defendants' motion will be denied in this respect as well.

### D.    Breach Of Contract

Defendants next argue that they are entitled to summary judgement on Plaintiffs'

breach of contract claim.  Defendants contend that SGS's terms of use permitted

Dominion to distribute the SGS Summary and that Dominion never provided SGS

materials to NATF.  Defendants also argue that Brian Starling, the Dominion engineer who

authored the NATF report, would have "no reason . . . to rely on SGS materials when

programming a different report."  Plaintiffs argue that a reasonable juror could find that

Starling had used the SGS Summary to develop a competing product, a violation of the

terms of use.  Plaintiffs disagree that the terms of use allowed Dominion to share the SGS

Summary with whomever it wished.  In their reply, the Defendants argue that there are no

facts to support the assertion that Starling used the SGS Summary as a template for the

NATF report.  Even if Starling did so use the Summary, the Defendants insist that such

actions would not breach the terms of use.

In New York, "[t]he essential elements of a cause of action to recover damages for

a breach of contract are the existence of a contract, the plaintiff's performance pursuant to

the contract, the defendant's breach of its contractual obligations, and the damages

resulting from the breach."  PFM Packaging Mach. Corp. v. ZMY Food Packaging, Inc., 16

N.Y.S.3d 298, 299-300 (2d Dep't 2015); see also Rexnord Holdings, 21 F.3d at 525 (2d

Cir. 1994).  In general, an agreement that is clear and complete should be enforced by the

plain meaning of its terms.  See W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162

(1990).  "Evidence outside the four corners of the documents as to what was really

32

intended but unstated or misstated is generally inadmissable to add to or vary the writing."
Giancontieri, 77 N.Y.2d at 162.

Ambiguity in a contract is an issue of law for the Court to resolve.  Id.  Courts,
however, should "'avoid an interpretation that would leave contractual clauses
meaningless.'"  Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings,
LLC, 50 N.Y.S.3d 13, 18 (App. Div. 1st Dep't 2017) (citing 150 Broadway N.Y. Assoc., L.P.
v. Bodner, N.Y.S.2d 63, 66 (App. Div. 1st Dep't 2004)).  "'[C]onflicting contract provisions
should be harmonized, if reasonably possible, so as not to leave any provision without
force and effect[.]'"  Natixis, N.Y.S.3d at 18 (citing Isaacs v. Westchester Wood Works,
718 N.Y.S.2d 338, 338 (App. Div. 1st Dep't 2000)).

Both parties appear to agree that the terms of use provided by SGS is, in fact, a
contract.  The disagreement arises from what contractual obligations were imposed on
Dominion and whether Dominion breached any of those obligations.  The pertinent parts
of the SGS terms of use read as follows:

> 1.8    Much of the information contained therein is the confidential trade
> secret and proprietary information of SGS which was developed at
> great expense to SGS. . . . Company cannot provide the Study or any
> portion thereof *except as provided in subsections 1.9 and 1.10* to third
> parties including, but not limited to, regulatory agencies, other
> transmission owners or operators which are not participating in the
> study, consultants, contractors, professional or trade associations and
> competitors of SGS without SGS's prior written approval.
>
> 1.9    Company is provided a Summary.  This document contains general
> information regarding SGS study methods and a limited number of
> anonymously-identified high-level summary performance values of
> other Participants.  Company is explicitly identified in its own
> Summary.  *Company, at its own discretion, may release and
> reproduce the Summary.*

Defendants' Statement at ¶ 40 (emphasis in original).  Section 1.8 obliges Dominion not to

share any of the confidential information within the SGS Study and Summary.  Section 1.9 is an exception to Section 1.8.  Section 1.8, however, appears to be an exception for only the SGS Summary.  The SGS Study cannot be shared without the written consent of SGS. When the contract states that Dominion "cannot provide the Study or any portion thereof *except as provided in subsections 1.9 and 1.10* to third parties," this does not mean that Section 1.9 applies to the SGS Study.  The Court interprets the exception outlined in Section 1.9 to apply only to the SGS summary.  What the contract means by the language in Section 1.8 is that the SGS Study cannot be shared, except for the parts of the study that are provided in the SGS Summary.

The Spindlers allege that Dominion shared more than just the SGS Summary. There is evidence that the NATF and SGS studies have striking similarities.  For example, both reports use a similar methods of pre-Screening and Six Sigma Screening.  Spindler Dec. at ¶¶ 117-134.  An expert for the Defendants has even admitted to the similarities of the two reports.  Brown Transcript at 177-178.  A reasonable juror could conclude that the similarities between the reports indicate that Defendants shared the Report, not just the Summary, with third parties in violation of the agreement.  A question of fact exists on this issue, and the motion for summary judgment will be denied in this respect too.

## IV.   EXPERT TESTIMONY

Both parties seek to preclude the other sides' experts from testifying at trial.  <u>See</u> dkt. #s 82-83.  Federal Rule of Evidence 702 "governs the admissibility of expert testimony."  <u>Showers v. Pfizer, Inc.</u>, 819 F.3d 642, 658 (2d Cir. 2016).  That Rule permits "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion" under certain conditions.  FED. R. EVID. 702.

To be qualified to testify, the "expert's scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).  In addition, "the testimony" must be "based on sufficient facts and date" and be "the product of reliable principles and methods."  FED. R. EVID. 702(b)-(c). Finally, the expert must have "reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702(d).  "The proponent of the testimony has burden to establish these admissibility requirements."  Showers, 819 F.3d at 642.

A district court has "broad discretion" in evaluating expert testimony.  McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995).  In carrying out its role as gatekeeper, a court must use a "flexible" approach that focuses on "the scientific validity–and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 594-95 (1993).  The court is to concentrate only on "principles and methodology," and "not on the conclusions that they generate."  Id. at 595.  Of course, "the types of factors to consider" in evaluating expert testimony "will 'depend upon the particular circumstances of the particular case at issue[.]" Showers, 819 F.3d at 658 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)).  The trial court's role is as "'gatekeeper," making sure "that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Id. (quoting United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)).  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]"  Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).  In determining whether the expert has the qualifications to testify, the court's role, "whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based," is to "'[make] certain that the

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 396.

Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable." United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015). "Expert testimony should be excluded where it is 'speculative or conjectural,' but arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of expert testimony.'" Robinson v. Suffolk County Police Dep't, 544 Fed. Appx. 29, 32 (2d Cir. 2013) (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). In determining whether expert testimony will assist the trier of fact, a court must be careful to remember that such testimony may not either "'usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it[.]'" Nimely, 414 F.3d at 397 (quoting United States v. Blizerian, 926 F.2d 1285, 1294 (2d Cir. 1991). The testimony should not attempt to "'tell the jury what result to reach'" or "'substitute the expert's judgment for the jury's.'" Id. (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)).

Plaintiffs move to preclude the testimony of Dr. Richard Brown, who has offered opinions for the Defendants on whether the Plaintiffs' metrics and study methods are unique or publically available and commonly known. Plaintiffs argue that Dr. Brown's report and testimony attempts to usurp the role of the jury by answering the ultimate question of whether the SGS Report contains trade secrets. Plaintiffs also seek to

preclude the testimony of Joseph J. Galanti, who the Defendants have retained as a damages expert.  Galanti is a forensic accountant.  Plaintiffs contend that Galanti's testimony relies on inadmissible hearsay, speculation, and conjecture and is therefore unreliable and inadmissible.  Moreover, Plaintiffs insist, portions of Galanti's report attempt to answer questions of liability that do not rely on his accounting expertise, but instead uses that expertise to provide unwarranted authority for his opinion on liability. Defendants seek to preclude the testimony of Michael J. Reilly, who Plaintiffs offer as an expert on damages.  Defendants contend that Reilly did not utilize any accepted methodology in reaching his opinions, lacked sufficient data for his conclusions, and engaged in mere speculation.  Finally, Defendants argue that Reilly should be precluded from offering any testimony rebutting Defendants' damages report because he was not offered as a rebuttal expert and did not include any criticims of Galanti's report in his own expert report.  The Court notes that neither side offers argument that the other party's experts somehow lack sufficient qualifications to offer expert testimony.

The problem with the parties' arguments is that they go to the weight of the experts' testimony and not whether the experts are actually qualified to offer such opinions–with one exception explained below.  Neither party challenges the qualifications of the other side's expert.  While Defendants attempt to argue that Plaintiff's expert does not use accepted scientific methods to reach his conclusions about the extent of the damages, that argument is unpersuasive; Defendants' complaint is clearly with the conclusions the expert draws more than with the means by which he reaches those conclusions.  While Defendants purport to concentrate on Reilly's  "principles and methodology," the focus of the argument is clearly "on the conclusions that they generate."  Daubert, 509 U.S. at 595.

37

Likewise, Plaintiffs' general arguments concerning both of Defendants' expert reports concern whether the opinions are persuasive, not whether they use an accepted methodology in their fields of expertise. On that basis, both parties' motions must be denied. The questions about the persuasiveness of the expert's reports can be argued to the jury.

The motions will be denied without prejudice, however, as the Court cannot at this point know how the expert testimony will be introduced at trial or to what use the parties will attempt to put that testimony. The parties may raise the issue of the admissibility of particular expert testimony at an appropriate time. This argument is particularly true with respect to Reilly's criticisms of Galanti's report. The Court is unable to determine whether such criticisms should be precluded until the Court is made aware of the exact nature of the testimony. Defendants may raise the issue at an appropriate point during trial.

The Court will grant one portion of Plaintiff's motion, however. The Second Circuit Court of Appeals has cautioned that "courts should be wary of opinion testimony whose 'sole function is to answer the same question that the trier of fact is to consider in its deliberations.'" United States v. Garcia, 413 F.3d 201, 210 (2d Cir. 2005) (quoting 4 WEINSTEIN'S FEDERAL EVIDENCE § 701.05 (2d ed. 2004)). "Indeed, the purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not so usurp the fact-finding function of the jury." Id. at 210-211.

In examining the reports of the various experts, the Court finds that one portion of Galanti's expert report shades too far towards usurping the jury's function for determining liability. See Galanti Report, dkt. # 82-5. Joseph Galanti is a Principal in the Forensic Advisory Services at Grant Thornton LLP in Atlanta Georgia. Id. at ¶ 5. He has a BA in

International Affairs with a concentration in International Economics, as well as an MBA, with a concentration in finance.  Id. at ¶ 6.  Both degrees are from George Washington University.  Id.  Galanti has 24 years experience "managing the preparation of financial models, economic projections, and related analyses used in the determination of financial damages and insurance claims.  Id. at ¶ 7.  He has also managed fraud and forensic accounting investigations.  Id.  He has written books and articles on the subject.  Id. at ¶ 8.  Galanti is also a Chartered Financial Analyst and a Certified Fraud Examiner.  Id. at ¶ 9.  Such experience and training qualifies Galanti to testify to the damages–if any–that Plaintiffs suffered as a result of Defendants' alleged trade secret manipulation, unfair competition, and breach of contract.

Most of Galanti's report addresses these issues, and his report and testimony on those issues will be admitted as explained above.  Portions of his report however, does not use any of this accounting knowledge to reach a conclusion and instead discusses reasons why SGS's customer base may have decreased.  Galanti points to:  "industry changes"; "reduced discretionary spending by utilities" as a result of the 2008 recession; a "lack of referrals from SGS Report customers"; the growing ability of NATF and NERC to produce their own reports[4] and the desire of other utilities to use such reports; Spindler's commitment to other benchmarking activities; the effect of a declining SGS customer base on SGS's ability to produce a useful report; "[u]nprofessional, offensive SGS communication"; Spindler's "admitted lack of interpersonal skills, enthusiasm, and sales ability"; the ease by which NATF members could submit data in a NERC-approved format;

---

[4]The subject of this action is whether NATF violated rights and agreements by producing this report.

"signals" that SGS planned to cancel its Report; and a "[l]ack of onfline benchmarking tools" offered by SGS.  Id. at ¶ 33.  Galanti does not utilize his areas of expertise–accounting and damage estimation–to reach these conclusions.  He instead offers a lay interpretation of the evidence and concludes that Defendants are not liable for their conduct.  The Court views these opinions as an attempt to provide an expert's imprimatur for an opinion derived from other than expert knowledge.  An expert may not usurp a jury's role in this way.  Galanti will be precluded from offering the opinions in paragraph 33 of his report.  The rest of Plaintiffs' motion regarding Galanti's testimony is denied with leave to renew should he attempt to testify to opinions not grounded in his expertise.

## V.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment, dkt. # 84 is DENIED.  Defendants' motion to preclude expert testimony, dkt. # 83, is DENIED with leave to renew at an appropriate time.  Plaintiff's motion to preclude expert testimony, dkt. # 82, is GRANTED IN PART and DENIED in PART.  The motion is GRANTED with respect to the opinions offered in Paragraph 33 of Joseph Galanti's expert report, and DENIED with leave to renew at an appropriate time in all other respects.

Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED**

Dated:        September 27, 2017