UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GREGG A. SPINDLER AND SUSAN L. SPINDLER, D/B/A
SGS STATISTICAL SERVICES,

Plaintiffs,

v.

VIRGINIA ELECTRIC AND POWER COMPANY D/B/A
DOMINION VIRGINIA POWER; AND NORTH
AMERICAN TRANSMISSION FORUM, INC.,

Defendants.

Civil Action No.
5:15-cv-00779 (TJM/TWD)

# PLAINTIFFS' TRIAL BRIEF

BOND, SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, New York  13202-1355
Telephone:  (315) 218-8000

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................II

BACKGROUND ...................................................................................................................... 1

ARGUMENT ............................................................................................................................ 7

I.  The evidence will show that SGS is entitled to recover damages on its trade secret misappropriation claim against NATF and Dominion......................................................... 7

    A.  SGS possessed a trade secret. .............................................................................. 7

    B.  NATF and Dominion used SGS's trade secrets in breach of an agreement, confidential relationship or duty, and/or as a result of improper means................... 9

    C.  As a result of this trade secret misappropriation, SGS is entitled to $3,424,203 in compensatory damages. ................................................................. 10

    D.  The Proof Will Support an Award of Punitive Damages to SGS because Defendants' trade secret misappropriation was gross and wanton. ......................... 11

II.  The evidence will show SGS is entitled to relief on its unfair competition claim against NATF. ................................................................................................................ 12

    A.  NATF misappropriated SGS's skills, expenditures, and labor to its own commercial advantage. ........................................................................................ 12

    B.  As a result of NATF's unfair competition, SGS is entitled to $3,424,203 in compensatory damages. ....................................................................................... 13

    C.  SGS is also entitled to punitive damages from NATF because NATF's unfair competition was aggravated by recklessness and willfulness. ...................... 14

III.  The evidence will show SGS is entitled to relief on its breach of contract claim against Dominion. ............................................................................................................ 15

    A.  Dominion breached its contract with SGS............................................................. 15

    B.  As a result of Dominion's breach of its contract with SGS, SGS is entitled to $ 3,424,203 in damages. .................................................................................... 16

IV.  Plaintiffs Will Be Entitled to Injunctive Relief................................................................. 17

CONCLUSION...................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

*A.F.A. Tours, Inc. v. Whitechurch,*
  937 F.2d 82, 87 (2d Cir. 1991), *aff'd,* 31 N.Y.2d 767 (1972)) .............................................. 11

*Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.,*
  2009 U.S. Dist. LEXIS 130133  (S.D.N.Y. Aug. 5, 2009) ...................................................... 10

*Big Vision Private, Ltd. v. E.I. DuPont De Nemours & Co.,*
  1 F. Supp. 3d 224 (S.D.N.Y. 2014) ...................................................................................... 10

*Cargill, Inc. v. Sears Petroleum & Transp. Corp.,*
  388 F. Supp. 2d 37 (N.D.N.Y. Aug. 25, 2005) ...................................................................... 12

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
  559 F.3d 110 (2d Cir. 2009) .................................................................................................... 7

*G.A. Braun, Inc. v. Giarratano,*
  2002 U.S. Dist. LEXIS 14188 (N.D.N.Y. July 30, 2002) ...................................................... 12

*Getty Petrol. Corp. v. Island Transp. Corp.,*
  878 F.2d 650 (2d Cir. 1989) .................................................................................................. 14

*Harris v. Seward Park Hous. Corp.,*
  79 A.D.3d 425 (1st Dep't 2010) ............................................................................................ 15

*Harrison v. Ford Motor Co.,*
  2013 U.S. Dist. LEXIS 85137 (N.D.N.Y. June 18, 2013) ...................................................... 14

*Imperial Chemical Indus. v. Nat'l Distillers & Chem. Corp.,*
  342 F.2d 737 (2d Cir. 1965) .................................................................................................... 8

*Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.,*
  920 F.2d 171 (2d Cir. 1990) .................................................................................................... 8

*ITC Ltd. v. Punchgini, Inc.,*
  9 N.Y.3d 467 (2007) .............................................................................................................. 12

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.,*
  69 A.D.3d 802 (2d Dep't 2010) ............................................................................................ 15

*Linkco, Inc. v. Fujitsu Ltd.,*
  230 F. Supp. 2d 492 (S.D.N.Y. 2002) .................................................................................... 13

*Member Servs. v. Sec. Mut. Life Ins. Co.,*
  2010 U.S. Dist. LEXIS 103776 (N.D.N.Y. Sept. 30, 2010) ................................... 7, 8, 10, 11

*Monovis, Inc. v. Aquino,*
  905 F. Supp. 1205 (W.D.N.Y. 1994) .................................................................................... 10

*Norbrook Labs v. G.C. Hanford Mfg. Co.,*
  297 F. Supp. 2d 463 (N.D.N.Y. 2003) ........................................................................ 7, 8, 10

*Schroeder v. Pinterest, Inc.,*
  133 A.D.3d 12 (1st Dep't 2015) ......................................................................................... 7, 8

ii

*Softel, Inc. v. Dragon Med. & Sci. Communs.,*
    118 F.3d 955 (2d Cir. 1997)............................................................................. 11

*Suburban Graphics Supply Corp. v. Nagle,*
    5 A.D.3d 663 (2d Dep't 2004)........................................................................ 13

*Topps Co. v. Cadbury Stani S.A.I.C.,*
    380 F. Supp. 2d 250 (S.D.N.Y. 2005)........................................................ 11, 16

*Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.,*
    487 F.3d 89 (2d Cir 2007)............................................................................... 16

Pursuant to the Court's Pretrial Order (Dkt. 31) of Hon. Thomas J. McAvoy, United States District Judge, Plaintiffs Gregg A. Spindler and Susan L. Spindler d/b/a SGS Statistical Services ("SGS"), by and through their attorneys, Bond, Schoeneck & King, PLLC, hereby submit this Trial Brief containing argument and citations on any and all disputed issues of law in this Action.

## BACKGROUND

In 1989, Gregg and Susan Spindler founded SGS in order to provide statistical consulting services. Since the early 1990s, SGS's customers have primarily been utility companies that provide electric power transmission to the United States and Canada. In 1995, the Spindlers began performing the SGS Transmission Reliability Benchmarking Study (the "SGS Study"), which enabled participants to assess and compare their system's performance with peers. Since then, for over two decades, the Spindlers have run the SGS Study annually, keeping the hallmarks of the Study consistent, but continuously improving and developing the Study's contents according to needs of its customers and changes within the industry.

The purpose of the SGS Study – transmission reliability benchmarking – is the development of reliability comparisons between different transmission companies at the system, voltage class, and circuit levels based on transmission circuit inventory and outage data. The performance measures at each of these levels are called "Benchmarks," and are produced for multiple transmission system service quality attributes, including transmission circuit outage frequency and outage duration, transmission circuit outages impacting retail and wholesale customers, transmission circuit outages impacting delivery points, and the quantification of root causes of transmission circuit outages. The SGS Study analyzes the Benchmarks for each individual transmission owner participant, aggregating the metrics into various multi-system averages and percentiles, and producing them for quarterly, annually, and multi-year averages.

Through a variety of formats, including bar charts, long term trend charts, tables, and output data files, the comprehensive SGS Study deliverables (the "SGS Report") provide this information to its customers for their own internal analysis.

The SGS Report expanded and evolved over time, growing from a 150-page binder of information in 1995 to a 400-page binder of charts, tables, and data.  In fact, beginning in 1999, the sheer volume of information contained in the SGS Report caused the Spindlers to provide a thirty-page executive summary (the "SGS Summary") for SGS's clients.

Participation in the SGS Study also increased over time.  From 1995 until 2001, SGS's client base increased dramatically, swelling from seven to thirty-one customers, constituting fifty percent of the United States transmission grid.  From 2001 until 2012, the pool of companies participating in the Study remained consistent, with high participation and low turnover.

SGS's methods, which were novel to the industry, were created and developed by the Spindlers over the course of twenty-one years.  The SGS Study was attractive to its customer base because of its unique, comprehensive engagement and ease-of-use presentation format, which offered at-a-glance performance comparisons not otherwise unavailable in the electric transmission industry.  By utilizing this flexible model, SGS eased pressure on its customers by removing the need for participants in the study to summarize their own data and by developing a program with participant-specific conversion codes to standardize data formats.  With this information, SGS developed a series of "data filters" to identify erroneous or anomalous outage and circuit data to ensure data integrity and quality, the primary key to SGS's ability to provide valid inter-system benchmarks.

These "data filters" consist of approximately twenty computer programs, each performing specific integrity checks in multiple categories.  The data filters are customized to

2

each participant, flag anomalous or erroneous data, assess for reasonableness, and compare past participant's data submissions with prior years of data. The Spindlers wrote these programs using SAS® software, a data management, reporting, and analysis system licensed by SGS from SAS Institute Inc. Dozens of custom-written SAS programs or modules – which consist of many thousands of lines of computer code requiring significant developing, programming, and validation time – produce the SGS Study.

Also integral to the SGS Study, is SGS's proprietary statistical screening methods. Prior to Defendants' misappropriation, the combined screening methods used in the SGS Study were unique and not otherwise used outside of the Study in the electric transmission industry. In addition, the SGS Study ranks transmission systems, voltage class, and individual circuit level performance by using one-number indicators of transmission reliability performance, called Transmission Availability Composite Scores ("TACS"). SGS developed TACS, and like the screening methods described above, did not exist in the electric transmission industry outside of the SGS Study until a substantially similar composite score was produced by the NATF in 2013.

The success of the SGS Study has been based, in large part, on its innovativeness. Accordingly, SGS has worked to keep its proprietary technology, formulae, processes, and methods confidential. SGS was able to establish its competitive advantage because it methods were not publicly available or generally known outside of SGS's customers, all of whom are required to keep the Study materials and information confidential.

In an effort to maintain the confidentiality of the proprietary technology, formulae, processes, and methods of SGS Study, SGS enters into contracts, containing confidentiality provisions restricting the use of the SGS Study and prohibiting the disclosure of the SGS Report to third parties (*e.g.*, professional or trade associations), with its clients. SGS's Terms of Use are

3

included in the proposal sent to participants each year, as well as in the SGS Report itself and in the invoices sent to participants. While the Terms of Use allow SGS's clients to release and reproduce the SGS Summary (***not*** the full SGS Report) under certain circumstances, the Terms of Use do not grant SGS's clients permission to use the SGS Summary for the benefit of third parties, such as trade associations or competitors.

To reinforce the confidentiality surrounding the SGS Report, the cover of the SGS Summary references the FERC Standards of Conduct and Critical Energy Infrastructure Information, which prevent free distribution of the information included therein. In addition, Mr. Spindler emphasizes the importance of the confidentiality of the SGS Report at the outset of each of its annual conferences, which are attended by representatives of the Study participants.

Defendant Virginia Electric Power Company d/b/a Dominion Virginia Power ("Dominion") began participating in the SGS Study in 2001. Dominion was a participant in the SGS Study as recently as 2013. In November of 2012, Stephen B. Edwards, Manager of Electric Transmission Reliability for Dominion, signed a contract on behalf of Dominion with SGS in which Dominion agreed, *inter alia*, to the Terms of Use containing the confidentiality requirements discussed above. The bulk of the information provided to Dominion by SGS was wholly confidential and proprietary, requiring passwords for access and clearly prohibiting distribution. The only deliverable Dominion could distribute was the SGS Summary, which does not detail proprietary trade secret information of SGS. Similarly, Dominion attended SGS's Annual Conferences, where SGS would discuss its methods and formulae, but never without presenting and discussing the Terms of Use contained in the SGS Study. SGS participants, including Dominion employees, testified in depositions in this case that they understood that the

4

information presented by SGS at is annual conferences and contained in the SGS Report were to be kept confidential.

In addition to being a client of SGS through the 2013 SGS Study year, Dominion is a member of Defendant the North American Transmission Forum ("NATF"). NATF became an independent trade association in or around January of 2010 with the stated intent to provide "best practices" benchmarking for the electric transmission industry. NATF established a metrics program, which consisted of a Metrics Working Group with associated sub-teams, to begin collecting transmission reliability data from its members. The majority of members of the Metrics Working Group were individuals who also served as SGS's primary technical contacts in the SGS Study for their respective organizations. One such individual was James "Brian" Starling, an employee of Dominion.

It was Mr. Starling who suggested that NATF develop and release a benchmarking study (the "NATF Report") on June 12, 2013, only weeks after he attended his fifth annual SGS conference. Mr. Starling also programmed NATF's outage metrics database (the "OMD") – the database used to create the NATF Report – and implemented a version of SGS's pre-Screening and Six Sigma Screening in July 2011; he was integral to the NATF Report. It was Mr. Starling who designed, programmed, and prepared the initial draft of the NATF Report that was released in draft form to certain members of the Metrics Working Group on July 10, 2013, finalized in of August 2013 and released to NATF members on September 18, 2013. In all, led by Mr. Starling, the NATF Report was conjured, designed, developed, and finalized in only three months.

It is undisputed that Defendants had access to SGS's trade secrets. Dominion was an SGS Study participant from 2001 until 2013, and Mr. Starling was SGS's main technical contact for five of those years. Mr. Starling admits to having access to the SGS Study deliverables and

5

that he attended five annual SGS conferences, the last of which he attended only weeks before suggesting the idea of the NATF Report. In addition to Mr. Starling's knowledge of SGS's trade secret methods, the various NATF Metrics Teams, and their subgroups, were composed almost entirely of participants in the SGS Study, with the majority of members being SGS's main technical contacts.

The first NATF Report was presented to its members at NATF's annual meeting on September 18-19, 2013. Accordingly, the NATF developed a report in only three months, from inception to distribution, which, in all respects, is remarkably similar to the SGS Summary, which took years to perfect. It took SGS decades to develop the SGS Report and the underlying formulae and methods. It is implausible, if not impossible, that Mr. Starling and NATF could develop a similar study in only three months without misappropriating the confidential and proprietary methods of SGS.

As a result of the release of the NATF Report and the Defendants' misappropriation of SGS's confidential and proprietary information, in 2013 and 2014, SGS lost eleven of its customers. Such a drop in participation from the Study was unprecedented. From 2012 to 2014, SGS's annual revenue decreased from $574,000 to $300,000. With additional losses of customers and revenue in 2015, 2016, and 2017.

We believe that after the proof has been presented at trial, the jury will agree that the wrongful conduct of NATF and Dominion damaged SGS – a company the Spindlers have spent over twenty years of their lives fostering. Accordingly, we will ask the jury to award SGS the damages to which it is entitled to rectify the harm that Dominion and NATF have caused and to award SGS punitive damages sufficient to discourage NATF, Dominion, and similar entities from acting in a similar way in the future.

6

# ARGUMENT

SGS should be granted all of the relief sought in its Complaint against NATF and

Dominion.

## I.   The evidence will show that SGS is entitled to recover damages on its trade secret misappropriation claim against NATF and Dominion.

SGS will prove, by a preponderance of the evidence, that it is entitled to recover damages

for trade secret misappropriation because: (1) SGS possessed trade secrets; (2) NATF and

Dominion used SGS's trade secrets in breach of an agreement, confidential relationship or duty,

or as a result of discovery by improper means; and (3) SGS suffered harm as a direct and

proximate result of NATF's and Dominion's use of SGS's trade secrets while NATF and

Dominion obtained a benefit.  *See Norbrook Labs v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d

463, 482-83 (N.D.N.Y. 2003); *see also Member Servs. v. Sec. Mut. Life Ins. Co.*, 2010 U.S. Dist.

LEXIS 103776, *23-24 (N.D.N.Y. Sept. 30, 2010).

### A.   SGS possessed a trade secret.

A trade secret is "any formula, pattern, device[,] or compilation of information which is

used in one's business and which gives him an opportunity to obtain an advantage over

competitors who do not know or use it."  *Schroeder v. Pinterest, Inc.*, 133 A.D.3d 12, 27 (1st

Dep't 2015) (internal quotations and citations omitted); *see also Faiveley Transp. Malmo AB v.*

*Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009); *Member Servs.*, 2010 U.S. Dist. LEXIS, at *24.

To aid in determining whether an alleged trade secret satisfies this definition, New York courts

have incorporated a six-factor test enumerated in the Restatement of Torts that considers:

> (1) the extent to which the information is known outside of [the]
> business; (2) the extent to which it is known by employees and
> others involved in the business; (3) the extent of measures taken by
> [the business] to guard the secrecy of the information; (4) the value
> of the information to [the business] to guard the secrecy of the
> information to [the business] and [its] competitors; (5) the amount

7

> of effort or money expended by [the business] in developing the
> information; and (6) the ease or difficulty with which the
> information could be properly acquired or duplicated by others.

*Schroeder*, 133 A.D.3d at 27 (alterations in original) (quoting *Rst. Torts* § 757, cmt. *b*); *see also*

*Norbrook Labs.*, 297 F. Supp. 2d at 483-84.

As these factors demonstrate, a trade secret does not consist of "single" or "ephemeral"

events; instead, "it is a process or device for continuous use in the operation of the business."

*See Member Servs.*, 2010 U.S. Dist. LEXIS, at *24-25 (citations omitted); *Norbrook Labs*, 297 F.

Supp. 2d at 483, 485.  Indeed, the unique combination of publicly available components or

characteristics can be a trade secret if the unified method affords the plaintiff a competitive

advantage.  *See Imperial Chemical Indus. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742

(2d Cir. 1965); *Integrated Cash Mgmt. Servs. v. Digital Transactions, Inc.*, 920 F.2d 171, 174

(2d Cir. 1990).

The proof at trial will show that SGS's trade secrets are comprised of a unique

combination of the screening of outage data, the application of exclusions, and the

implementation of various statistical analyses that SGS developed over the course of many years

as a unique benchmarking analysis for the electric transmission industry.  While some

components of this benchmarking analysis may have been commonly known, the composite

whole constitutes a unique, unified methodology that provided the Spindlers a competitive

advantage in the industry.  In fact, until the issuance of the NATF Report, the SGS Study was not

just *a* unique benchmarking analysis, it was *the* unique benchmarking analysis in the industry.

That, for years, the SGS Study was *the* unique benchmarking analysis in the industry

supports the contention that SGS took great strides to keep its methodology and analysis secret.

The proof at trial will show that SGS forbade clients from sharing the SGS Study, and that any

information contained in the shareable SGS Summary consisted only of general information

8

about how SGS collects data and presents only limited reliability benchmarks, leaving out the methodology behind the data. In short, a comparison of the SGS Summary and SGS Study clearly will show that SGS's claimed trade secrets are contained only in SGS Study deliverables which are not permitted to be disclosed beyond participants.

The proof at trial also will show that, in an effort to maintain the confidentiality of the SGS Report and trade secrets contained therein, every year, SGS includes in its study proposal, invoices, and the Report itself, Terms of Use requiring confidentiality. Mr. Spindler also will testify that SGS permits *only* representatives of clients that are bound by the Terms of Use to attend the portions of the annual SGS conference during which trade secrets and proprietary information are discussed. Furthermore, third parties or contractors working with SGS throughout the years have done so only after signing nondisclosure and confidentiality agreements. The proof also will show that only limited information is available on SGS's website about its services and deliverables, and that Mr. Spindler did not disclose trade secrets in his marketing materials and presentations. Indeed, the proof will show that both Mr. Starling and Mr. Edwards admitted in their deposition testimony that they believed the entire SGS Study, including the Summary, was confidential.

When all the evidence is proffered, SGS will have proven, by a preponderance of the evidence, that it possessed a unique combination of methods used to screen and analyze outage data, the application of exclusions, and the implementation of various statistical analyses, and that it has taken reasonable steps to maintain the confidentiality thereof.

**B.     NATF and Dominion used SGS's trade secrets in breach of an agreement, confidential relationship or duty, and/or as a result of improper means.**

Two indicators of use of a trade secret in breach of an agreement, confidential relationship or duty, or as a result of improper means are (1) a party's access to a trade secret and

9

subsequent production of a "substantially similar" product; and/or (2) a "hastened" production process. *See Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 2009 U.S. Dist. LEXIS 130133, *73 (S.D.N.Y. Aug. 5, 2009) (collecting cases); *Member Servs.*, 2010 U.S. Dist. LEXIS, *29; *see generally Big Vision Private, Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 275 (S.D.N.Y. 2014). Thus, the speed at which a defendant creates a misappropriated product, compared with the amount of time it took the plaintiff to create the original, weighs heavily in favor of demonstrating improper use of a trade secret. *See Norbrook Labs*, 297 F. Supp. 2d at 474-78, 485-86; *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994).

The proof at trial will show that both Dominion and NATF had access to the SGS Study. Indeed, as corroborated by the testimony of experts proffered by the Defendants, the NATF Report bears a remarkable similarity to the SGS Study – a similarity so stark that recipients of the NATF Report who also had years of experience with the SGS Report were "surprised" by the likeness. The significance of these similarities is heightened by the rapid speed with which the NATF, led by the efforts of Mr. Starling – Dominion's technical contact for the SGS Study – developed and produced its report: it took SGS over a decade to develop and perfect the SGS Study, its deliverables, and its underlying methods and formulae, yet NATF achieved the same, *just three months* from the inception of the idea to the issuance of the first Report. While this accelerated achievement would be inexplicable under any other circumstance, when combined with NATF's and Dominion's access to the SGS Study and similarities between the two reports, it proves that NATF and Dominion misappropriated SGS's trade secrets.

## C. As a result of this trade secret misappropriation, SGS is entitled to $3,424,203 in compensatory damages.

As a result of the trade secret misappropriation by NATF and Dominion, SGS is entitled to damages for its actual monetary loss from misuse of its trade secrets, as well as (to the extent

10

such an award is not duplicative of actual monetary loss), the value of the benefit received by NATF and Dominion as a result of their misuse of SGS's trade secrets. *Member Servs.*, 2010 U.S. Dist. LEXIS, at \*94-95; *see also Softel, Inc. v. Dragon Med. & Sci. Communs.*, 118 F.3d 955, 969 (2d Cir. 1997).

The proof at trial will show that SGS lost thirteen customers, totaling $3,424,203 in revenue, as a result of NATF's and Dominion's misappropriation of its trade secrets. The loss of participants in the SGS Study, however, not only has resulted in the loss of real revenue, but also in the erosion of the SGS Study. Simply put, the larger the pool of any benchmarking study participants (*i.e.*, a critical mass), the more reliable the comparison data is for all participants. As a result, the loss of these thirteen clients not only has resulted in a loss of revenue to SGS, but also significantly has impacted the future viability of the SGS Study and value to its customers. In addition to the proof of damages to SGS, the proof at trial will also show that NATF gained not only the destruction of a competitor in the field, but also the benefit of a value added service for its members.

**D.    The Proof Will Support an Award of Punitive Damages to SGS because Defendants' trade secret misappropriation was gross and wanton.**

Punitive damages may be awarded for trade secret misappropriation where the defendant's actions are wanton. *See A.F.A. Tours, Inc. v. Whitechurch*, 937 F.2d 82, 87 (2d Cir. 1991) (citing *Huschle v. Battelle*, 33 A.D.2d 1017 (1st Dep't 1970), *aff'd,* 31 N.Y.2d 767 (1972)); *see also Topps Co. v. Cadbury Stani S.A.I.C.,* 380 F. Supp. 2d 250, 266-67 (S.D.N.Y. 2005).

The proof at trial will show that NATF, a multi-national conglomerate of transmission entities, and Dominion, a large transmission entity itself, demonstrated conscious indifference and utter disregard for the trade secret rights of SGS, a mom-and-pop entity run out of the

11

Spindlers' home in Upstate New York.  Despite knowing the strides taken by SGS to protect its trade secrets and the sheer amount of time, resources, and money that went into creating their trade secrets, NATF and Dominion consciously decided to take advantage of a small business to achieve their own ends.  The testimony and evidence proffered at trial will demonstrate that these large entities, and other such entities, must be discouraged from trampling on the intellectual property rights of small businesses like SGS.

## II.   The evidence will show SGS is entitled to relief on its unfair competition claim against NATF.

SGS will prove, by a preponderance of the evidence, that it is entitled to recover on its unfair competition claim against NATF because it can show that NATF, with bad faith or immorality, misappropriated SGS's skill, expenditures, and labor to NATF's commercial advantage.[1]  *See G.A. Braun, Inc. v. Giarratano*, 2002 U.S. Dist. LEXIS 14188, *10 (N.D.N.Y. July 30, 2002); *see also Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 67 (N.D.N.Y. Aug. 25, 2005).

### A.   NATF misappropriated SGS's skills, expenditures, and labor to its own commercial advantage.

Unfair competition by misappropriation "usually concerns the taking and use of the plaintiff's property to compete against plaintiff's own use of the same property."  *See ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007) (citations omitted).  Beyond this concern, "[t]he trend of the law, both statutory and decisional . . . has been to extend the scope of the doctrine of unfair competition, whose basic principle is that commercial unfairness should be restrained whenever it appears that there has been a misappropriation, for the advantage of one person, of property belonging to another."  *See id.* (quotations omitted).

---

[1] As this Court has noted, this case is *not* a palming-off unfair competition case.  *See* <u>Docket No. 105</u>, p. 31 of 40.

The proof at trial will show that SGS devoted over two decades of time, money, and resources to develop the SGS Study, including the trade secrets contained therein.  This Study, and all the effort taken to develop it, made SGS the market pioneer for transmission reliability benchmarking for many years.  SGS's success made it a target for NATF, with NATF not only relying on the SGS Study to create its own report, but also specifically aiming to replace SGS as the primary benchmarking resource for the industry.

The proof at trial will show that NATF's targeting of SGS led to the duplication of critical aspects of the SGS Study by NATF, to such an extent that individuals who had years of experience with the SGS Study deliverable not only noted the substantial similarities between the reports, but, in-fact, assumed that the SGS Report had been copied.  The proof will convince a jury that that NATF sought to avoid paying SGS for the considerable work, time, and effort it expended to develop the SGS Study, instead taking and using the material for its own competitive advantage to the significant detriment of SGS.

### B. As a result of NATF's unfair competition, SGS is entitled to $3,424,203 in compensatory damages.

As a result of NATF's wrongful conduct, SGS is entitled to the "amount which the [SGS] would have made but for [NATF's] wrong[.]"  *Suburban Graphics Supply Corp. v. Nagle*, 5 A.D.3d 663, 666 (2d Dep't 2004) (citations omitted); *see, e.g., Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002).

The proof at trial will show that, if NATF had not competed unfairly with SGS, then SGS would not have lost thirteen customers, $3,424,203 in revenue, and the long-term viability of its Study.  For a benchmarking study, the maintenance of a sufficient pool of participants is integral to its success.  The fewer the customers, the more difficult it is to market a benchmarking study, and the more detrimental NATF's unfair competition has been to the long-term viability of the

13

Study.  As a result, as the testimony and evidence adduced at trial will show, SGS has been damaged in the amount of at least $3,424,203.

   **C.     SGS is also entitled to punitive damages from NATF because NATF's unfair competition was aggravated by recklessness and willfulness.**

   For unfair competition claims, New York law "clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness, . . . whether or not directed against the public generally . . ." *Getty Petrol. Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) (citations and internal quotations omitted) (alterations in original); *Harrison v. Ford Motor Co.*, 2013 U.S. Dist. LEXIS 85137, *38-39 (N.D.N.Y. June 18, 2013).

   The proof at trial will demonstrate that NATF was keenly aware of SGS's intellectual property rights, yet chose instead to trample recklessly on the Spindlers' rights by using the Study to develop its own reliability report.  Only months before the issuance of the NATF Report, Gregg Spindler reached out to representatives of NATF in an attempt to collaborate and provide services to the association.  Rather than establish a productive working relationship with SGS, NATF, through the integral involvement not only of Brian Starling, but of an army individuals familiar with the SGS Study, wrongfully used the SGS Study to create its own benchmarking report.  These individuals were all bound to keep the Study confidential.  Such behavior represents a high degree of immorality.  Indeed, the majority of individuals who participated in the NATF's metrics programs were also participants in the SGS Study, had access to the Study deliverables and the underlying methods, and discussed SGS with stunning frequency at their meetings.  A punitive damages award would deter NATF, and others like it, from engaging in similar behavior in the future.

III.    **The evidence will show SGS is entitled to relief on its breach of contract claim against Dominion.**

SGS will prove, by a preponderance of the evidence, that it is entitled to recover on its breach of contract claim against Dominion because a contract existed between the parties, SGS performed its obligations thereunder, Dominion breached the contract through Mr. Starling's conduct, and SGS suffered damages as a result of Dominion's breach. *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010); *see also JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803 (2d Dep't 2010).

A.    **Dominion breached its contract with SGS.**

The proof at trial will show that Dominion entered into a contract with SGS on November 5, 2012.  Under the terms of this contract, SGS agreed to provide to Dominion the SGS Study (the "Dominion Report") and the Data Filter Report.  SGS performed, providing the Dominion Report and the Data Filter Report to Dominion on May 13, 2013 and January 12, 2013, respectively.  Additionally, as a member of the SGS Study, Dominion had access to password-protected reports made by SGS that were contained on SGS's Members Only Page.

The reports on the Members Only Page, the Dominion Report, and the Data Filter Report all contained the methods and formulae used by SGS to filter raw data provided to it by its clients, and the methodology SGS used to ensure valid and reliable benchmarking.  The proof at trial will show that the information contained in these reports was, in large part, confidential trade secret and proprietary information.  Indeed, Dominion agreed to as much when it signed the contract with SGS, which contained confidentiality provisions prohibiting Dominion from sharing the Study with third parties, and provided Dominion with a non-exclusive license to use the SGS Study for its own internal use.  Further the Terms of Use on the Members Only Page

and in the Reports SGS provided Dominion buttressed the understanding between SGS and Dominion that the information contained in these reports was confidential.

The proof at trial will show that, despite SGS's complete performance under the contract and its clear terms, Dominion breached its agreement with SGS. It is not disputed that Mr. Starling, an engineer employed by Dominion, authored the NATF Report and performed programming for NATF. The evidence, including Defendants' expert testimony, will show striking similarities between the SGS Study and the NATF Report. Accordingly, the proof at trial will show that Mr. Starling used the SGS Study as a template for his work, thereby using the SGS Study to benefit NATF and breaching Dominion's contract with SGS.

**B.    As a result of Dominion's breach of its contract with SGS, SGS is entitled to $ 3,424,203 in damages.**

SGS is entitled to damages in an amount that will put it in the same economic position it would have occupied had Dominion performed the contract. *See Topps Co.*, 380 F. Supp. 2d at 261 (citations omitted). SGS may recover for its lost profits in the amount of $3,424,203 either as general or as consequential damages. SGS can recover its lost profits as general damages because its lost profits are the natural and probable consequence of Dominion's breach of contract. *Biotronik v. Conor Medsystems*, 22 N.Y.3d 799, 805-06 (N.Y. 2014). If its lost profits are determined to be consequential, SGS is entitled to the recovery of its lost profits from Dominion because: (1) the existence of damage is reasonably certain to have been caused by Dominion's breach of contract; (2) the extent of SGS's loss is capable of proof with reasonable certainty; and (3) it has established that the damages were fairly within the contemplation of the SGS and Dominion. *Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir 2007).

## IV. <u>Plaintiffs Will Be Entitled to Injunctive Relief</u>

In their Complaint, SGS has requested that the Court enjoin the Defendants, and anyone acting on their behalf or in concert with them, from using the SGS Study deliverables or the trade secrets contained therein as well as from using any imitation or derivation of SGS's confidential and proprietary formulas and methods.  Accordingly, if the jury finds in favor of SGS on any of its causes of action, then SGS will request that the Court invoke its equitable jurisdiction to enjoin the NATF from the continued use of the NATF Report in its current form.

## <u>CONCLUSION</u>

For the reasons set forth above, and based on the expected proof at trial, Defendants' defenses lack merit, and SGS is entitled to all relief requested in the Complaint.  Accordingly, judgment should be entered in favor of SGS.

Dated: January 29, 2018

BOND, SCHOENECK & KING, PLLC

By: _____
    Brian J. Butler (510105)
    Suzanne M. Messer (514398)
One Lincoln Center
Syracuse, New York 13202-1355
Telephone:  (315) 218-8000
E-mail:  bbutler@bsk.com
E-mail:  smesser@bsk.com

*Attorneys for Plaintiffs*

17